This is a case about a United States citizen being extradited under a treaty that doesn't allow for the extradition of U.S. citizens for a crime that we wouldn't consider a crime here in the United States. How is it the treaty doesn't allow? It may not provide for, but isn't that different from allowing? Isn't that different from prohibiting? Why do the treaty doesn't permit extradition? It doesn't permit it in the sense that the Supreme Court in Valentine looked at it and said this language doesn't authorize it. Doesn't authorize it, doesn't allow you to do it. There are lots of things that don't get authorized, but also don't prohibit. Why does that mean that extradition can't be accomplished by relying upon something different, in this case the statute? This is getting into the 3196 argument. The statute purports to remedy what's going on in the treaty without going through the... The Supreme Court's decision makes a point of saying there's nothing else that authorizes. Yes. Congress can address this. Congress addressed it. Why isn't that the end of the issue? I'm not sure that they do say Congress can address it. They say one possibility is that there are statutes, but they also go on to use this language about whatever the power of Congress to legislate in this area. It's somewhat equivocal about whether Congress even can legislate in this area. And I do think there's an argument that it makes sense that you would deal with something like... I hear that argument, but that doesn't mean that the treaty prohibits, which is the argument you're making. The treaty doesn't allow. I think you've got a good argument, and the Supreme Court supports it. The treaty doesn't authorize. But I don't see anything in the treaty that speaks to the issue of whether Congress has the power to enact a statute. I don't believe the treaty is saying whether Congress has the power to enact it. The treaty on its own terms doesn't allow for it. You couldn't take the treaty and say, okay, here, I'm going to go extradite you. It doesn't authorize. Okay. But if there's nothing in the treaty that prohibits Congress from doing something else, and your objection to congressional action has to be based on a different ground, I have trouble with the proposition the treaty prohibits extradition. I mean, perhaps does not authorize is a better language, but I think the fundamental point that we're making there is that there's a change here, especially from the perspective of the American citizen being extradited. You have the treaty. Under the treaty, he's not extraditable. You have Congress step in, purport to remedy these 34 Valentine treaties, render him extraditable. That's a substantial change that should be going through the treaty process. Why? Is there anything that prohibits Congress from enacting a statute like 3196? I would say two things, Your Honor. One is that it's already a matter that the treaty, I believe, is speaking on. It's saying, you know, we don't give the power to extradite our own citizens. So Congress is stepping in, doing something different from the treaty. There's a conflict that we believe should go through the treaty process. As Judge Clifton said, why is there a conflict between 3196 and the treaty? Again, it goes to the basic level of the extraditable citizen who previously was not extraditable. You passed 3196. Now he's extraditable. Suppose Congress, there was no statute, I mean, there was no treaty, and Congress passed a statute like 3196. Could the Secretary of State allow somebody to be extradited at the request of a foreign government? That's a different question that I think is not well addressed in the briefs, but I'm not so sure they could. It seems to me that extradition is more of a treaty matter than a congressional legislation matter. I don't see anything, for instance, in Article I, Section 8, saying, you know, Congress shall have the power to determine extradition if the President hasn't spoken on it in the treaty. Does the Constitution address extradition? No, it speaks of the treaty power going to the President and various legislative powers going to Congress. I don't see anything in there identifying that as one of Congress's powers. And extradition seems more like a treaty matter. This is a reciprocity, relations between countries. The whole idea of treaties is that you have this, you know, stable, ongoing relationships that survive individual political regimes within the country. I actually think it's really notable. Any precedent on any subject where the Supreme Court or any other court has said, this is a subject that can be addressed only by treaty, Congress doesn't have the power to enact a statute? None that I'm aware of, Your Honor. Well, I'll tell you that this argument comes up in a context I'm likely more familiar with than anybody else in the room because Hawaii was annexed, became a territory of the United States by way of joint resolution of Congress, not by way of treaty between the Kingdom and then the Republic of Hawaii and then the United States. And there are people who continue to argue in Hawaii that that wasn't a lawful way to annex a new territory. And yet I'm still sitting here as a United States citizen and a judge of the United States Federal Court. So the argument's out there, but I've never seen an instance where it's gotten traction. And you're now trying to offer it up, and there's a first time for lots of things. But can you point us to anything that would give the argument some traction, that in fact that limits the power of Congress because a given subject can be addressed only by treaty? I mean, I would just point to, again, to Article I, Section 8, that lays out enumerated powers for Congress. Those are, as I understand it, what Congress is limited to doing. I don't see anything in there that points to extradition. If it's okay, Your Honors, I'd like to pivot to the question of dual criminality. And that, I think, is the narrowest ground and one that doesn't force this Court to delve into constitutionality or conflicts between treaties and statutes. So dual criminality is the requirement that the acts for which the requested country is seeking extradition, in fact, constitute a crime here in the U.S. This requirement protects people in this country from being hailed into a foreign court and punished in some distant land for acts that we don't actually consider serious crimes here. And I have four points that I want to make about it. The first of these is that the lower courts here use the wrong framework to analyze dual criminality. So I don't actually think there's a useful decision from below for this Court to work from. Dual criminality doesn't require, and I think this is in both briefs, it doesn't require identical elements, scope of liability, name of the offense. The really important thing is that under these laws, the laws of both nations, the underlying conduct makes out an offense. So, and again, I don't think the parties are disputing this. Every case I've looked at, there is an investigation of the underlying conduct matching against the U.S. elements to see is this actually an offense here. Here, the district judge, the magistrate judge, they don't do this. They just compare the two statutes. In our case, do the elements have to be identical? No, no, they don't have to be identical. But where there's a problem is if there's a difference in the elements that's relevant to the case, and that's actually what happens here. Here, the Czech statute doesn't contain this wrongfulness element for extortionary threats that the U.S. statute does. So the district court looked at this and said, well, you know, it's mostly the same. We're missing wrongful, but that's, you know, that's not a big deal. Well, because they don't have to be identical, we'll just move on. What they don't do is ever look at the actual underlying conduct. And if you do look at the underlying conduct, you start to run into a real problem here because his conduct is not wrongful under the meaning of the law. That's my second point. Wrongful is not a gut decision. It's not just looking at the conduct and saying, hey, that looks bad to me. It's specific. It's something that's unlawful either as to the means or as to the ends. And that difference is important here because in the U.S. and we do discuss this in briefing, we allow hard bargaining that they may not allow in other countries. You know, we allow Yelp to remove positive reviews to force people to buy ad revenue. We allow a protester to go to a developer and say, hey, I'll stop protesting if you give me $20,000 for my semi-pro football. We allow these things that I think would be barred under the check statute. So in order for the means to be unlawful, the alleged victim must have a right to be free from the threatened harm. And in order for the ends to be unlawful, the defendant must have sought payment for something that they had no right to be paid for. And I think, sorry, it's in addition not just that they had no right, but that they knew that they had no right to be paid for. And if you take these and you apply these to the facts of the two underlying incidents here, the Telexis situation and the Eurotel situation, you start to see that his conduct was not wrongful. Why wouldn't his conduct have arguably violated 1951 attempted extortion? Again, because in neither instance is he asking for something that he has no legal right to do. He has no legal right to ask for, or is he threatening to do something that the party has a legal right to be free from doing? So, for instance, with the Telexis situation, he is, just to kind of give the facts really briefly, there's a 1998 contract. He helps, between Telexis and Eurotel, he helps broker that contract. He gets paid a commission under that. Nobody says that the commission was wrong. Then, instead of using an option clause in that contract, the parties write a new contract in 1999. It appears from the decision, the decision's a little hard to read, but it appears to me from the decision that under the option clause he would have been entitled to a commission. He goes to Telexis and says, hey, you guys went around me. I believe that I deserve a commission in this circumstance. He goes back to them several times and threatens to tell Eurotel not to complete the deal. So, if you look at this, he's asking for money that he believes that he has a right to, so it's not wrongful as to the ends, and it's not wrongful as to the means, because the thing being threatened is just that he's going to go to another person or another entity that Telexis does business with and say, hey, I wasn't treated fairly. And Telexis has absolutely no right to keep, you know, if it's treating someone who does business unfairly, it has no right to kind of keep that secret. So, in neither instance is he doing something that is, sorry, with neither regard to the ends or the means is he doing something that he's not permitted to do. The same goes for the Eurotel situation. That one, Eurotel issues these scratch coupons that are supposed to be scratch-off, but instead someone can look at them and see what the underlying code is by looking under a light. This gets publicized, apparently without any help from Mr. Notek. It's a competitor, tells Eurotel about it first. It is published on the Internet. He finds out about the problem, investigates the problem, discovers people are fraudulently taking advantage of it, and then tries to get paid for his investigation and for his proposed solution. I'm going to go to you, sorry, he goes to Eurotel and he says, I figured out some people are misusing this. I've spent money to do that, I can tell you their names, I have an idea for how to deal with them, but you need to pay me for that. And Eurotel had no right to get that information without paying him, so he's not threatening, and no right, I mean there's some dispute as to whether he actually made any threat to take this to the press, but certainly no right to have their mess up not broadcast in the press. And the thing that he's asking for is not illusory, he's not just asking for money for no work, he's offering to do work on their behalf. And again, so the ends there are not unlawful either. But let me ask you this, doesn't our extortion statute or attempted extortion and the Czech Republic's extortion statute, aren't they just really trying to get at sort of these tactics, these threatening tactics? We're a little bit more demanding, but the Czech Republic isn't. But they're still trying to get at the same harm. They're trying to get at the same harm, so you can call the statutes. So if you look at our case law, another case, I don't understand why that doesn't qualify as dual criminality. Because the dual criminality inquiry is not what the district court hears. It's not looking at the statutes and saying, hey, there's substantial analysis, you have to, sorry, analogous. They have to take the subsequent step of actually going through the elements and saying, this actually makes out the elements of the offense in the U.S. It's not enough to just say, hey, they're pointed at the same harm, so we're not going to worry about what he actually did. Well, that's not my understanding, but you started out by saying they don't have to have the same elements. They don't. In the end, you say, well, they have to have the same elements. I'm not saying they have to have the same elements at all. I'm saying that you have an offense in the U.S., you have an offense in the Czech Republic, the underlying conduct has to make out the offense in both places. Those offenses don't have to have the same name, they don't have to have the same element, but it has to be a crime in both places. Thank you, Your Honor. May it please the Court. I was prepared to start with the constitutional analysis, but given the discussion as to the facts, perhaps it might be helpful if I clear up some of these facts and show why Mr. Notek's conduct was wrongful and why there is evidence in the record for the magistrate judge and the district court to arrive at what they did. We're not dealing with somebody who's just unhappy with a business deal. We're dealing with somebody who did not participate in a negotiation. That is a fact that was established and found by the municipal court after trial in the Czech Republic. The court came out and said he didn't participate in it, and as a result, he is not entitled to any commission from TeleAxis. Now, the TeleAxis told Mr. Notek that we're not going to pay you, you didn't do anything. And rather than say, I disagree, I'm going to bring a lawsuit against you, I'm going to go through these means, what he says is, fine, I'm going to interfere with your business relationship with the other person in the contract, Eurotel. And what he did was work with a co-conspirator in the press department of Eurotel to hold up payments. He received a contract that he was not entitled to have and held onto it, and that was one of the bases that was used to prevent TeleAxis from getting sold. The co-conspirator with whom he was working with delayed meetings between TeleAxis and Eurotel to raise this issue, and it was only when they finally were able to get in the door that it came to light what Mr. Notek was doing. But even on that day, when that meeting was going to take place, what did Mr. Notek do? He sent text messages to the CEO of Eurotel saying that the guy I'm dealing with over at TeleAxis, he was seen the other day fleeing from Slovenia to Vienna in his underwear, because creditors whom he didn't pay burned down his house. He tried to discredit them. The court found that. At the same time, he engaged in other wrongful behavior with a wrongful purpose. He went to Eurotel and said, you know, I found out about these Go coupons for this telephone, and you want to know something? I went ahead, and you didn't ask me, but I just did this investigation on my own, and I know who's doing it, and if you pay me money, I'm going to go ahead, and I'll make sure it goes away. In this country, we have that happen many times in this country. You know, buildings burn down in this neighborhood. You have a store. If you pay me money, I'll make sure your building doesn't burn down. That essentially is one of the things that he's doing. Then he went ahead, and when Eurotel said we're going to investigate this further and bought some time, he went ahead and communicated with the press. There are communications that the Prague Court noted between the media source that revealed this and Mr. Notek, and when that didn't work, he went to the police and presented partial information to them and launched a police investigation in this to continue to put pressure on this. This is not the conduct of somebody who is acting and doing hard bargaining. This is somebody who's trying to extort something that he's not entitled to. He wasn't entitled to a commission from Teleaxis, and he wasn't entitled to any money from Eurotel, and this is why it falls within the Hobbs Act statute here for extortion. Even though the Prague Court did not have to find that element, as we do here in the United States, the record that's in there in the government's excerpts of record, which contains both the opinion of the Prague Court and the high court, lays out all the evidence that goes to that wrongful purpose. So the magistrate judge said, look, I've got a conviction from a foreign country. I am required to rely on that conviction the same way that a foreign country is required to rely on our conviction. But even without that, we still get to the point where there's evidence in the record. And while he didn't enumerate it. The conduct that's identified in the record, what happened in the Czech Republic, is also a crime in the United States. And he did that. He determined looking at this court's decision in Russell and looking at the analysis he had to do and said that there was evidence in the record. And I can take the evidence of the conviction alone, and that's sufficient in order to go this. But he could have, and he pointed to the record to say the evidence is there to fall within the, in both countries, in both the Czech Republic and in the United States. In addition to this. So if you just look at the, your point, your argument is if you just look at the basis for the Czech conviction. Well, I think. But they require, they don't require wrongfulness. That in itself means that it's a crime here in the United States? No, we've got to compare it to the statute here. And while the judge didn't go through a formal analysis of that, he did say there was evidence in the record that the wrongfulness issue was dealt with. And the reality is we've got cases. Did he say that the wrongfulness element is satisfied here that's required in the United States? I don't think he came out and specifically said that, but he did come back. It's your position that it is. If we were to do that analysis, we would conclude that what happened here, what happened in the Czech Republic. Absolutely, Your Honor. Also. Absolutely. Absolutely. Because not only do you have a wrongful purpose in this, wrongful conduct in here, he's seeking things that he is not entitled to, which goes to the, which basically undermines what they're arguing. Because they're arguing the premise of the entire argument of why the Hobbs Act doesn't apply is that he was entitled to these things. He was entitled to a commission. He was entitled to money for an investigation that wasn't requested. Once you take that out of it, it's no longer hard bargaining. This is somebody who's trying to extort somebody else. So unless the Court has any further questions on that, I can move to the constitutionality issue. Your Honor pointed out a little while ago that there really was no conflict between the treaty and 3196. And the treaty doesn't prohibit the extradition of United States citizens. The 1925 treaty specifically says that the, Article 1 says both governments shall extradite individuals found in their territories. And there's a limitation to that, which is Article 8, which is the subject of this appeal, that neither party shall be bound to deliver up its own citizens. That's a big difference from saying neither party shall deliver up its own citizens. And when the Supreme Court looked at this in Valentine, they didn't look at the similar language as a bar. What they said is that there's no explicit grant of authority. And they gave the government two options, either legislate it or go ahead and do it by treaties. They didn't say you have to do one or the other. And there was nothing that suggested you couldn't do both. In the 82 years since Valentine, the government has done both. We've gone ahead and renegotiated treaties. We've entered into new treaties where we specifically give that grant of authorization, that explicit authorization for the Secretary of State to return a United States citizen. And in 1990, Congress said, well, we're going to go ahead and put this piece of legislation at 3196 in order to deal with the issue of Valentine and follow the second option given to us by the Supreme Court. So the specific grant of authority is there. So as long as it's not barred by the treaty, it's up to the Secretary of State to make a decision on whether or not to return a United States citizen to another country. So the question then comes in, is it constitutional? Well, if you look at the case law that developed after 3196, the case of Hilario, Ravello-Menegro, Sakharovic, the basic case out of the Sixth Circuit, and the Krizmat case out of Florida, every one of those cases say that what you're not doing is amending the statute. You're just going ahead and amending a gap in U.S. code. You're filling in a gap, and you're giving that authorization. The only case in the country that disagrees with that approach is the first case that came after 3196, and that was the Gurdjieff case. But that's a unique case because what happened is Portugal, who has similar language to what the Czech Republic has, tried to extradite an individual before 3196 went into place, and the magistrate judge said no. Based on the language of the statute in Valentine, you don't have the authorization to send this person back. Congress passed 3196, and the Portuguese came back and tried it again. And the court came back and said, no, it's retroactive. We're not going to allow you to do it. But what the court didn't do is say that 3196 was unconstitutional. And the courts that have followed in line with that, including the Hilario case, which dealt with the same treaty, came back and said, no, this is fine. You've got that grant of authority, so you can go ahead and continue to send people overseas. In addition to that, Your Honor, we also take a look at the practice of the parties in order to give us some guide of what's happening. And what's happening is that we continue to return people to foreign nations. And we cited a case in there, the Dahlgren case, which is where we return a U.S. citizen to the Czech Republic to stand trial back in 2015. You don't have the constitutional issue. And because you don't have a conflict between the statute and the treaty, the last-in-time rule doesn't come into play. And if the court wants, I'm happy to go into that and talk about the permutations of that. But it doesn't seem that you ever get to that point. At the end of the day, what you have is you've got an individual that engaged in conduct that would be criminal, both in the United States and in the Czech Republic. It doesn't matter that the laws are not identical. This Court has actually addressed that in the Cho versus Torres case. And you can have a country in which the statute's a little broader-based or a little more narrowly-based and still have the dual criminality. So it's the position of the United States, Your Honor, that it is appropriate to return Mr. Notek to the Czech Republic to stand trial, that there is no bar... Service time. To service time in the Czech Republic. Thank you, Your Honor. To return him to service time, and that there is no constitutional bar, there is no treaty bar, there is no statutory bar to returning him, and there is ample evidence in the record to support that return. Thank you very much, Your Honor. Thank you. You can have a minute for rebuttal. Thank you, Your Honor. I just want to briefly address some of the factual stuff that opposing counsel brought up. With regard to the tele-access situation, opposing counsel left out the timeline here. This business with the contract being held and the payment being delayed, that happens in August. All the discussions between tele-access and Mr. Notek are back in April. Sorry, January through April. He never returns and says, hey, I'm holding up these contracts, pay me money.  And he did broker the original deal, and so that is the basis for his at least believing that he was entitled to a payment under the contract. Going on to the other situation, the government really doesn't point to anything illegal. They just say his services weren't wanted. The case law is full of this Court saying it's not enough that they're unwanted. It's just that you're offering something that somebody doesn't want, and you can look at the United Brotherhood of Carpenters case for that. And then I would just say, lastly, the issue about whether the district court and the magistrate judge looked at this. The sections in the excerpts of record are at 55, 56, and 62, 63. There is no march through the elements to say this meets the element. In fact, the district court in a footnote says it doesn't have to do that. The matter is submitted at this time, and we'll turn to our last case that's on the calendar, which is Stephen Schneider v. Ford Motor Company.
judges: Parker, Paez, Clifton